## KEOGH v. CHICAGO & NORTHWESTERN RAIL-WAY COMPANY ET AL.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 51. Argued October 12, 1922.—Decided November 13, 1922.

1. Approval of rates as reasonable and non-discriminatory, by the Interstate Commerce Commission, fixes their character as such in relation to a shipper who took part in the proceedings. P. 161.
2. A combination of carriers to fix rates may be illegal and subject to proceedings by the Government, under the Anti-Trust Act, even though the rates are reasonable and non-discriminatory, and, it seems, even though they have been approved by the Interstate Commerce Commission. P. 161.
3. But a private shipper cannot recover damages from the carriers in such a case, under § 7 of the Anti-Trust Act, upon the ground that he lost the benefit of rates still lower, which, but for the conspiracy, he would have enjoyed, because:
(a) The fact that a rate results from a conspiracy in violation of the Anti-Trust Act does not render it necessarily illegal; and, as the legality of rates is determined by the Act to Regulate Commerce, and the shipper who suffers from illegal (unreasonable or discriminatory) rates has his remedy in damages under that act, it seems that Congress did not intend to provide him a further remedy for such illegal rates under § 7 of the Anti-Trust Act, and a fortiori none where the rates fixed by the conspiracy were found legal by the Commission. P. 162.
(b) The right of action given by § 7 of the Anti-Trust Act to one " injured in his business or property," implies violation of a legal right; but the legal right of a shipper respecting a carrier's rates is measured by the published tariff, and, to enforce a departure from this through a recovery under § 7, would be, in effect, to give the shipper an illegal preference. P. 163.
(c) Recovery would depend upon the plaintiff's proving that lower rates, which, but for the conspiracy, the carriers would have maintained, would have been non-discriminatory—a question which, generically, must first be submitted to the Interstate Commerce Commission, yet which, specifically, is not within its cognizance, because hypothetical. P. 163.

(d) The damages, if any, resulting to the shipper from the establishment of the higher rates could not be proved by facts from which their existence and amount were logically and legally inferable, but are purely speculative. P. 164.

271 Fed. 444, affirmed.

ERROR to a judgment of the Circuit Court of Appeals, affirming a judgment of the District Court for defendant railroad companies and individuals, in an action brought by Keogh under § 7 of the Anti-Trust Act to recover damages alleged to have resulted from a combination to fix railroad rates, in restraint of interstate commerce.

·Mr. H. P. Young, with whom Mr. W. T. Alden, Mr. C. R. Latham and Mr. Charles Martin were on the briefs, for plaintiff in error.

Sections 1 and 2 of the Anti-Trust Act prohibit all contracts and combinations which directly restrain trade or commerce.

Competition is the natural law of trade and the Anti-Trust Act was intended to prevent any contracts or combinations which destroy or stifle competition.

The mere fact that the rates fixed and maintained by the combination of the defendant companies were not excessive or unreasonable does not constitute a defense to an action under the Anti-Trust Act. Standard Oil Co. v. United States, 221 U. S. 1, 65; United States v. American Tobacco Co., 221 U. S. 106, 179; United States v. Joint Traffic Association, 171 U. S. 505, 571; United States v. Trans-Missouri Freight Association, 166 U. S. 290, 339; United States v. Union Pacific R. R. Co., 226 U. S. 61, 83; Northern Securities Co. v. United States, 193 U. S. 197, 340; Thomsen v. Cayser, 243 U. S. 66, 86; Grenada Lumber Co. v. Mississippi, 217 U. S. 433.

The right of a railroad company to charge reasonable rates does not include the right to enter into an agreement or combination to maintain reasonable rates.

It was the duty of the defendants to compete, and the Anti-Trust Act has a stricter application to them than to combinations of persons or corporations engaged in private pursuits. *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, 336; *Thomsen* v. *Cayser,* 243 U. S. 66, 85; *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61, 86.

The natural effect of competition is to lower rates, and the direct and immediate effect of the agreement or combination described in the declaration was to increase the rates over the prevailing competitive rates.

The declaration alleges that plaintiff was compelled to pay more than a reasonable competitive rate, and that his business was injured and he suffered a loss of profits. These are proper elements of damage under the statute.

A general allegation of damages is sufficient, especially where no special demurrer or motion to make more specific is filed. The amount of such damages should have been submitted to the jury.

The findings of the Interstate Commerce Commission are not a bar to this suit, nor even admissible in evidence. The Commission has no power to decide questions arising under the Anti-Trust Act, and it has so held in the decisions relied upon in the special pleas of defendants.

The Commission is an administrative body and its findings have only the effect provided by statute. The act creating it does not give its findings any effect in other than proceedings under the Commerce Act. Even where the Commission makes a money award, its order is only *prima facie* evidence of the facts therein stated. *Meeker* v. *Lehigh Valley R. R. Co.,* 236 U. S. 412.

The finding of the Commission relates to a maximum rate which carriers must not exceed. It has no power to name the specific rate to be charged, nor can it determine the reasonable rates that would prevail under natural or competitive conditions.

Plaintiff is entitled under the Constitution to have a jury pass upon the issues and assess the damages.

Even in an action under the Commerce Act to recover damages for excessive freight charges, wherein the award of damages made by the Commission is admitted as *prima facie* evidence, the plaintiff is entitled to a jury trial.

The mere fact that the increased rates were filed with the Commission and published by the defendants separately, does not exempt them from liability under the Anti-Trust Act for their unlawful acts in agreeing jointly upon the rates. The Commerce Act cannot be made a refuge for violators of the Anti-Trust Act.

*Mr. Bruce Scott,* with whom *Mr. R. V. Fletcher, Mr. Kenneth F. Burgess* and *Mr. J. C. James* were on the brief, for defendants in error.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This action, under § 7 of the Anti-Trust Act, July 2, 1890, c. 647, 26 Stat. 209, was brought by Keogh in the federal District Court for Northern Illinois, Eastern Division, in November, 1914. Eight railroad companies and twelve individuals were made defendants. The case was heard upon demurrer to a special plea; the demurrer was overruled; judgment was entered for defendants, plaintiff electing to stand upon his demurrer; and this judgment was affirmed by the Circuit Court of Appeals for the Seventh Circuit. 271 Fed. 444. The case is here on writ of error.

The cause of action set forth was this: Keogh is a manufacturer of excelsior and flax tow at St. Paul, Minnesota. The defendant corporations are interstate carriers engaged in transporting freight from St. Paul to points in other States. Prior to September 1, 1912, these carriers formed an association known as the Western

Trunk Line Committee. The individual defendants are officers and agents of the carriers and represent them in that Committee. It is a function of the Committee to secure agreement in respect to freight rates among the constituent railroad companies, which would otherwise be competing carriers. By means of such agreement, competition as to interstate rates from St. Paul on excelsior and tow was eliminated; uniform rates were established; and interstate commerce was restrained. The uniform rates so established were arbitrary and unreasonable; they were higher than those theretofore charged; and they were higher than the rates would have been if competition had not been thus eliminated. Through this agreement for uniform rates Keogh was damaged. The declaration contains a schedule of the amounts paid by him in excess of those which would have been paid under rates prevailing before September 1, 1912, and which, but for the conspiracy, would have remained in effect. He claims damages to the extent of this difference in rates. He also alleges as an item of damages that the increase in freight rates lessened the value of his St. Paul factory through loss of profits.

Defendants set up the fact that every rate complained of had been duly filed by the several carriers with the Interstate Commerce Commission; that upon such filing the rates had been suspended for investigation, upon complaint of Keogh, pursuant to the Act to Regulate Commerce, February 4, 1887, c. 104, 24 Stat. 379, 384, as amended; that after extensive hearings, in which Keogh participated, the rates were approved by the Commission; and that they were not made effective until after they had been so approved. The character of the proceedings before the Commission was more fully shown by reference to *Keogh* v. *Chicago, Burlington & Quincy R. R. Co.*, 24 I. C. C. 606; also *Rates on Excelsior and Flax Tow from St. Paul, Minn.*, 26 I. C. C. 689; *Rates*

*on Excelsior and Flax Tow from St. Paul, Minn.*, 29 I. C. C. 640; *Morris, Johnson, Brown, Manufacturing Co. v. Illinois Central R. R. Co.*, 30 I. C. C. 443; *The Excelsior and Flax Tow Cases*, 36 I. C. C. 349.

The case is presented on these pleadings. Whether there is a cause of action under § 7 of the Anti-Trust Act is the sole question for decision. Keogh contends that his rights are not limited to the protection against unreasonably high or discriminatory rates afforded him by the Act to Regulate Commerce; that under the Anti-Trust Act he was entitled to the benefit of competitive rates; that the elimination of competition caused the increase in his rates; and that, as he has been damaged thereby, he is entitled to recover. The instrument by which Keogh is alleged to have been damaged is rates approved by the Commission. It is, however, conceivable that, but for the action of the Western Trunk Line Committee, one, or more, of these railroads would have maintained lower rates. Rates somewhat lower might also have been reasonable. Moreover, railroads had often, in the fierce struggle for business, established unremunerative rates. Since the case arose prior to the Transportation Act 1920, February 28, c. 91, § 418, 41 Stat. 456, 474, 485, the carriers were at liberty to establish or maintain, even unreasonably low rates provided they were not discriminatory. Compare *Interstate Commerce Commission v. Baltimore & Ohio R. R. Co.*, 145 U. S. 263, 277; *Skinner & Eddy Corporation v. United States*, 249 U. S. 557, 565.

All the rates fixed were reasonable and non-discriminatory. That was settled by the proceedings before the Commission. *Los Angeles Switching Case*, 234 U. S. 294. But under the Anti-Trust Act, a combination of carriers to fix reasonable and non-discriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by injunction

45646°—23——11

under § 4, and by forfeiture under § 6. That was settled by *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and *United States* v. *Joint Traffic Association,* 171 U. S. 505. The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government. It does not, however, follow that Keogh, a private shipper, may recover damages under § 7 because he lost the benefit of rates still lower, which, but for the conspiracy, he would have enjoyed. There are several reasons why he cannot.

A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the Act to Regulate Commerce. Under § 8 of the latter act the exaction of any illegal rate makes the carrier liable to the "person injured thereby for the full amount of damages sustained in consequence of any such violation" together with a reasonable attorney's fee. Sections 9 and 16 provide for the recovery of such damages either by complaint before the Commission or by an action in a federal court. If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings. *Louisville & Nashville R. R. Co.* v. *Ohio Valley Tie Co.,* 242 U. S. 288. Can it be that Congress intended to provide the shipper, from whom illegal rates have been exacted, with an additional remedy under the Anti-Trust Act? See *Meeker* v. *Lehigh Valley R. R. Co.,* 162 Fed. 354. And if no remedy under the Anti-Trust Law is given where the injury results from the fixing of rates which are illegal, because too high or discriminatory, may it be assumed that Congress intended to give such a remedy where, as here, the rates complained of have been found by the Commission to be legal and while in force had to be collected by the carrier?

Section 7 of the Anti-Trust Act gives a right of action to one who has been " injured in his business or property." Injury implies violation of a legal right. The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. *Texas & Pacific R. R. Co. v. Mugg,* 202 U. S. 242; *Louisville & Nashville R. R. Co. v. Maxwell,* 237 U. S. 94; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Robinson,* 233 U. S. 173; *Dayton Iron Co.* v. *Cincinnati, New Orleans & Texas Pacific Ry. Co.,* 239 U. S. 446; *Erie R. R. Co.* v. *Stone,* 244 U. S. 332. And they are not affected by the tort of a third party. Compare *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Fink,* 250 U. S. 577. This stringent rule prevails, because otherwise the paramount purpose of Congress— prevention of unjust discrimination—might be defeated. If a shipper could recover under § 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors. It is no answer to say that each of these might bring a similar action under § 7. Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief. Compare *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, 440.

The character of the issues involved raises another obstacle to the maintenance of the action. The burden resting upon the plaintiff would not be satisfied by proving that some carrier would, but for the illegal conspiracy, have maintained a rate lower than that published. It would be necessary for the plaintiff to prove, also, that

the hypothetical lower rate would have conformed to the requirements of the Act to Regulate Commerce. For unless the lower rate was one which the carrier could have maintained legally, the changing of it could not conceivably give a cause of action. To be legal a rate must be non-discriminatory. And the proceedings before the Commission in this controversy illustrate how readily claims of unjust discrimination arise. See *Morris, Johnson, Brown, Manufacturing Co. v. Illinois Central R. R. Co.*, 30 I. C. C. 443. For this reason, it is possible that no lower rate from St. Paul on tow and excelsior could have been legally maintained without reconstituting the whole rate structure for many articles moving in an important section of the country. But it is the Commission which must determine whether a rate is discriminatory; at least, in the first instance. See *Abilene Case, supra; Great Northern Ry. Co. v. Merchants Elevator Co.*, 259 U. S. 285. It has been suggested that this requirement does not necessarily bar an action involving that issue; for a court might suspend its proceeding until the question of discrimination had been determined by the Commission. But here the difficulty presented could not be overcome by such a practice. The powers conferred upon the Commission are broad. It may investigate and decide whether a rate has been, whether it is, or whether it would be discriminatory. But by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination. And that hypothetical question is one with which plaintiff would necessarily be confronted at a trial.

Finally, not only does the injury complained of rest on hypothesis (compare *International Harvester Co. v. Kentucky*, 234 U. S. 216, 222–224); but the damages alleged are purely speculative. Under § 7 of the Anti-Trust Act, as under § 8 of the Act to Regulate Commerce, *Pennsyl-*

*vania R: R. Co.* v. *International. Coal Mining Co.*, 230 U. S. 184, recovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted.   These damages must be proved by facts from which their existence is logically and legally inferable.   They cannot be supplied by conjecture.[1]  To make proof of such facts would be impossible in the case before us.   It is not like those cases where a shipper recovers from the carrier the amount by which its exaction exceeded the legal rate. *Southern Pacific Co.* v. *Darnell-Taenzer Co.*, 245 U. S. 531.   Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers.  Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him.   Every competitor was entitled to be put—and we must presume would have been put—on a parity with him.   And for every article competing with excelsior and tow, like adjustment of the rate must have been made:   Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him.   The benefit might have gone to his customers, or conceivably, to the ultimate consumer.

*Affirmed.*

---

[1] Compare *Central Coal & Coke Co.* v. *Hartman*, 111 Fed. 96; *Motion Picture Patents Co.* v. *Eclair Film Co.*, 208 Fed. 416; *Locker* v: *American Tobacco Co.*, 218 Fed. 447; *American Sea Green Slate Co.* v. *O'Halloran*, 229 Fed. 77, 79; *Noyes* v. *Parsons*, 245 Fed. 689.